Slip Op. 16-9

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **APEX FROZEN FOODS PRIVATE LIMITED ET AL.,**<br><br>     **Plaintiffs,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>     **Defendant,**<br><br>**and**<br><br>**AD HOC SHRIMP TRADE ACTION COMMITTEE,**<br><br>     **Defendant-Intervenor.** | **Before: Claire R. Kelly, Judge**<br><br>**Court No. 14-00226**<br>**Public Version** |

## OPINION

[Sustaining U.S. Department of Commerce's final determination in the eighth administrative review of the antidumping duty order covering certain frozen warmwater shrimp from India.]

Dated: February 2, 2016

<u>Robert Lewis LaFrankie, II</u>, Hughes Hubbard & Reed LLP, of Washington, DC, argued for plaintiffs.  With him on the brief were <u>Alexandra Bradley Hess</u> and <u>Matthew Robert Nicely</u>.

<u>Patricia Mary McCarthy</u>, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, argued for defendant.  With her on the brief were <u>Joshua Ethan Kurland</u>, Trial Attorney, <u>Benjamin C. Mizer</u>, Principal Deputy Assistant Attorney General, and <u>Jeanne E. Davidson</u>, Director.  Of Counsel on the brief was <u>Scott Daniel McBride</u>, Senior Attorney, Office of the Chief Counsel for Trade and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Nathaniel Jude Maandig Rickard</u>, Picard, Kentz & Rowe, LLP, of Washington DC, argued for defendant-intervenor.  With him on the brief was <u>Jordan Charles Kahn</u>.

Kelly, Judge:  This matter is before the court on Plaintiffs Apex Frozen Foods Private Limited, et al.'s (collectively "Plaintiffs") motion for judgment on the agency record pursuant to USCIT Rule 56.2.  Plaintiffs contest various aspects of the U.S. Department of Commerce's ("Commerce" or "Department") final determination in the eighth administrative review of the antidumping duty order on certain frozen warmwater shrimp from India, covering the period of February 1, 2012 through January 31, 2013.  See generally Certain Frozen Warmwater Shrimp From India, 79 Fed. Reg. 51,309 (Dep't Commerce Aug. 28, 2014) (final results of antidumping duty review; 2012–2013) ("Final Results"), as amended, 79 Fed. Reg. 55,430 (Dep't Commerce Sept. 16, 2014) and accompanying Issues and Decision Memorandum for the Final Results of the Antidumping Duty Administrative Review of Certain Frozen Warmwater Shrimp from India, A-533-840, (Aug. 20, 2014), available at http://enforcement.trade.gov/frn/summary/india/2014-20401-1.pdf (last visited Jan. 25, 2016) ("Final I&D Memo"); see also Certain Frozen Warmwater Shrimp From India, 70 Fed. Reg. 5,147 (Dep't Commerce Feb. 1, 2005) (notice of amended final determination of sales at less than fair value and antidumping duty order) ("Order").  For the reasons set forth below, Commerce's final results are supported by substantial evidence and in accordance with law.

## BACKGROUND

Commerce issued the antidumping duty order covering certain frozen warmwater shrimp from India on February 1, 2005.  See Order, 70 Fed. Reg. at 5,147.  After receiving timely requests to conduct an administrative review from several companies, including

domestic producer Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee ("Defendant-Intervenor"), on April 2, 2013 Commerce initiated the eighth administrative review of the Order for the period of February 1, 2012 through January 31, 2013.  See Certain Frozen Warmwater Shrimp From India and Thailand, 78 Fed. Reg. 19,639, 19,639 (Dep't Commerce Apr. 2, 2013) (notice of initiation of antidumping duty administrative reviews); Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part, 78 Fed. Reg. 25,418, 25,420 (Dep't Commerce May 1, 2013); see also Request for Administrative Reviews at 1–2, PD 9 at bar code 3121314-01 (Feb. 28, 2013).

Pursuant to Section 777A(c)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1677f-1(c)(2) (2012),[1] Commerce found it was not practicable to examine each of the known exporters and producers of subject merchandise and thus limited the review to the two companies that, according to U.S. Customs and Border Protection ("CBP") import data, accounted for the largest volume of subject merchandise exported to the United States to serve as mandatory respondents for the administrative review—(1) Devi Fisheries Limited and its affiliates Satya Seafoods Private Limited and Usha Seafoods (collectively "Devi Fisheries"); and (2) Falcon Marine Exports Limited and its affiliate K.R. Enterprises (collectively "Falcon Marine").  See Selection of Respondents for Individual Review at 1–2, 4, PD 25 at bar code 3133307-01 (May 1, 2013); see also Decision Memorandum for the Preliminary Results of the 2012-2013 Administrative Review of the

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

Antidumping Duty Order on Certain Frozen Warmwater Shrimp from India at 2, A-533-840, (Mar. 18, 2014), available at http://enforcement.trade.gov/frn/summary/india/2014-06559-1.pdf (last visited Jan. 25, 2016) ("Prelim. I&D Memo").  Accordingly, Commerce issued questionnaires to and received responses from Devi Fisheries and Falcon Marine from May 2013 through January 2014.  See Prelim. I&D Memo at 2–3.

Commerce published its preliminary results on March 25, 2014.  See Certain Frozen Warmwater Shrimp From India, 79 Fed. Reg. 16,285, 16,285 (Dep't Commerce Mar. 25, 2014) (preliminary results of antidumping duty administrative review; 2012-2013) ("Prelim. Results"); see also Prelim. I&D Memo at 1.  After applying its differential pricing analysis, Commerce preliminarily found that the mandatory respondents' sales revealed a pattern of significant export price differences among purchasers, regions, or time periods and determined that "compar[ing] . . . the weighted average of the normal values to the export prices . . . of individual transactions" ("A-T") was appropriate to calculate dumping margins for both Devi Fisheries and Falcon Marine in the preliminary results. See Prelim. I&D Memo at 7; 19 C.F.R. § 351.414(b)(3) (2013);[2] see also 19 C.F.R. § 351.414(c)(1).  For Devi Fisheries, the results of the differential pricing analysis led Commerce to apply A-T to all of Devi Fisheries' U.S. sales.  See Calculations for Devi Fisheries Limited for the Preliminary Results at 1–2, CD 136 at bar code 3189206-01 (Mar. 18, 2014) ("Devi Fisheries' Prelim. Calcs."); see also Prelim. I&D Memo at 7.  By contrast, the differential pricing analysis as applied to Falcon Marine led Commerce to

---

[2] Further citations to Title 19 of the Code of Federal Regulations are to the 2013 edition, unless otherwise noted.

apply A-T only to the portion of Falcon Marine's U.S. sales that constituted the observed pattern of significant price differences and compared "the weighted average of the normal values to the weighted average of the export prices" ("A-A") for all of its other U.S. sales. See Calculations for Falcon Marine Exports Limited for the Preliminary Results at 1–2, CD 145 at bar code 3189251-01 (Mar. 18, 2014) ("Falcon Marine Prelim. Calcs.") 19 C.F.R. § 351.414(b)(1); see also Prelim. I&D Memo at 7.   Accordingly, Commerce preliminarily calculated weighted-average dumping margins of 1.97% for Devi Fisheries and 3.01% for Falcon Marine, from which Commerce assigned a rate of 2.49% to the other exporters and producers covered by the review.   See Prelim. Results, 79 Fed. Reg. at 16,286–89.

Commerce published the final results on August 28, 2014.   See generally Final Results, 79 Fed. Reg. 51,309.   Commerce continued to find that the mandatory respondents' sales exhibited a pattern of export prices of comparable merchandise that differ significantly among purchasers, regions, or time periods as per the results of the differential pricing analysis and made no changes to Devi Fisheries' or Falcon Marine's margin calculations from the preliminary results.   See id. at 51,309; see also Final I&D Memo at 1, 22–26, 35–39.   Additionally, Commerce reaffirmed its decision to reject portions of certain respondents'[3] (collectively "Respondents") case brief for containing untimely filed new factual information.   See Final I&D Memo at 40–42.

---

[3] On May 2, 2014, certain respondents submitted a case brief disputing the propriety of the differential pricing analysis.   See generally Respondents' Rejected Case Brief, PD 150–51 at bar

Plaintiffs now challenge Commerce's determination in the final results on numerous grounds.  First, Plaintiffs initially argued that Commerce did not have the legal authority to engage in a targeted dumping analysis or differential pricing analysis and thereafter apply A-T in the context of an antidumping duty administrative review.  See Pls.' Rule 56.2 Mot. J. Agency R. 10–15, Apr. 3, 2015, ECF No. 36 ("Pls.' Mot.").  Plaintiffs concede in their reply papers that recent precedent from the Court of Appeals for the Federal Circuit makes clear that Commerce has the authority to apply the alternative A-T method in reviews, however, Plaintiffs still contend that the Court of Appeals for the Federal Circuit's decision is not dispositive and controlling on all of the issues in this case. See Plaintiffs' Reply Brief 3, Sept. 30, 2015, ECF No. 57 ("Pls.' Reply").  Second, Plaintiffs contend Commerce violated the Administrative Procedure Act ("APA") by not following the APA's notice and comment rulemaking requirement before applying the differential pricing analysis.  See Pls.' Mot. 18–20.  Third, Plaintiffs argue that Commerce failed to comply with the so-called "limiting rule" and "allegation requirement" as provided within its regulations.  See id. at 15–18.  Fourth, Plaintiffs challenge certain aspects of Commerce's differential pricing analysis.  See id. at 20–45.  Specifically, Plaintiffs argue that Commerce (i) failed to establish a discernable pattern of export prices of comparable merchandise that differ significantly among purchasers, regions, or time periods because

---

code 3199459-01 (May 2, 2014).  The respondents who submitted the case brief included the following companies: Falcon Marine, Devi Fisheries, Apex Frozen Foods Private Limited, Asvini Fisheries Private Ltd., Avanti Feeds Limited, Bluepark Seafoods Private Ltd., Five Star MarineExports Private Limited, Jagadeesh Marine Exports, Jayalakshimi Sea Foods Private Limited, Liberty-Group, Nekkanti Sea Foods Limited, Sagar Grandhi Exports Pvt. Ltd., SAI Marine Exports Pvt. Ltd., Sandhya Marines Limited, Sprint Exports Pvt. Ltd., Star Argo Marine Exports Private Limited, Suryamitra Exim Pvt. Ltd., and Wellcome Fisheries Limited.

of its use of averages and consideration of all sales in the analysis, see id. at 20–28, 43–45, (ii) failed to adequately explain why A-A could not account for such differences, see id. at 28–36, and (iii) improperly used, what Plaintiffs refer to as, "double-zeroing" in calculating Falcon Marine's antidumping duty margin. See id. at 37–43. Finally, Plaintiffs maintain that Commerce wrongfully rejected portions of Respondents' administrative case brief as untimely filed new factual information. See id. at 45–46. For these reasons, Plaintiffs argue that Commerce's determinations in the final results are unsupported by substantial evidence and otherwise not in accordance with law.

Defendant United States ("Defendant") argues that Commerce has the authority to engage in the differential pricing analysis and thereafter apply A-T in the context of administrative reviews, see Def.'s Resp. Opp'n Pls.' Rule 56.2 Mot. J. Agency R. 10–13, Aug. 13, 2015, ECF No. 43 ("Def.'s Resp."), the withdrawn regulations have never applied to administrative reviews, see id. at 14–17, the APA did not require Commerce to employ notice and comment rulemaking for its change in practice to the differential pricing analysis, see id. at 17–21, and Commerce properly rejected portions of Respondents' administrative case brief as untimely filed new factual information. See id. at 45–46. Defendant also maintains that Commerce's use and application of its newly implemented analysis in the final results are supported by substantial evidence and in accordance with law. See id. at 21–44.

The court holds that Commerce's final results are supported by substantial evidence and in accordance with law and are therefore sustained.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012),[4] which grant the court authority to review actions contesting the final determination in an administrative review of an antidumping duty order.  The court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.   Commerce Has Authority to Use the Differential Pricing Analysis and Apply A-T in Administrative Reviews

Plaintiffs' Rule 56.2 motion argued that Commerce lacks authority to apply the alternative A-T methodology in administrative reviews. See Pls.' Mot. 10–15.  Defendant and Defendant-Intervenor respond that, contrary to Plaintiffs' position, neither the antidumping duty statute nor the legislative history prohibit use of the differential pricing analysis or application of A-T in administrative reviews and in support cite to the Court of Appeals for the Federal Circuit's recent decision in JBF RAK LLC v. United States, 790 F.3d 1358 (Fed. Cir. 2015).  See Def.'s Resp. 10–13; Def.-Intervenor Ad Hoc Shrimp Trade Action Committee's Resp. Pls.' Rule 56.2 Mot. J. Agency R. 8, 13–15, Aug. 13, 2015, ECF No. 42 ("Def.-Intervenor's Resp.").  The court holds that Commerce has the authority to engage in its differential pricing analysis to decide which comparison methodology to use for calculating dumping margins and thereafter apply A-T in the context of an administrative review when appropriate.

---

[4] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

To determine whether merchandise is being sold in the United States at less than fair value and, if so, to calculate the antidumping duty rate for the individually examined exporters and producers, Commerce must compare normal value to the export price of each entry of subject merchandise.[5]   See 19 U.S.C. § 1675(a)(2)(A)(ii); 19 U.S.C. § 1677b(a); 19 U.S.C. § 1677(35)(A).  The statute provides that Commerce shall ordinarily use A-A to calculate dumping margins in an investigation, but may use A-T as an alternative to the default A-A method if certain conditions are met.   See 19 U.S.C. § 1677f-1(d)(1)(A)–(B).  Congress, however, has not dictated which comparison methodology Commerce must use in administrative reviews nor has it provided for when Commerce may use A-T in reviews.   The only further guidance the statute provides with respect to Commerce's use of A-T in a review is that when applying A-T, Commerce "shall limit its averaging of prices to a period not exceeding the calendar month that corresponds most closely to the calendar month of the individual export sale."   19 U.S.C. § 1677f-1(d)(2).   Commerce's regulations provide that Commerce will apply A-A to calculate dumping margins in investigations and reviews unless another method is

---

[5] Normal value is the first sales price of the subject merchandise in the exporting country, See 19 U.S.C. § 1677b(a)(1)(A)–(B), or, if not sold in the exporting country, the sales price of the subject merchandise in a similar exporting country "other than the exporting country or the United States." 19 U.S.C. § 1677b(a)(1)(B)(ii); 19 U.S.C. § 1677b(a)(1)(C).  Export price is the first sales price to an unaffiliated purchaser of the subject merchandise in the importing country, i.e., United States, or an unaffiliated purchaser for exportation to the importing country.  See 19 U.S.C. § 1677a(a). Commerce calculates a respondent's dumping margin by determining "the amount by which the normal value exceeds the export price of the subject merchandise."  19 U.S.C. § 1677(35)(A).

appropriate in a particular case, but do not provide further guidance regarding what those circumstances may be.  See 19 C.F.R. § 351.414(c)(1).[6]

As a result, to determine whether to employ an alternative method to calculate dumping margins in reviews, Commerce has by practice chosen to adopt the approach it uses in investigations, which follows the statutory directive under 19 U.S.C. § 1677f-1(d)(1)(B).  In the preliminary results, Commerce explained that analogous to its approach in antidumping duty investigations, Commerce engages in an analysis consistent with § 1677f-1(d)(1)(B) in administrative reviews to "examine[] whether to use the [A-T] method as an alternative comparison method."   Prelim. I&D Memo at 5. Therefore, as a matter of practice, Commerce applies A-T instead of the default A-A method in an administrative review if there is a pattern of export prices for comparable merchandise that differ significantly among purchasers, regions, or time periods, provided that Commerce explains why the A-A method cannot account for those price differences. See Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin and Assessment Rate in Certain Antidumping Duty Proceedings; Final Modification, 77 Fed. Reg. 8,101, 8,102 (Dep't Commerce Feb. 14, 2012) (announcing that Commerce intends to apply a comparison methodology in reviews in a manner that parallels investigations) ("Final Modification").  Accordingly, to evaluate whether the conditions for

---

[6] While a comparison of "the normal values of individual transactions to the export prices of individual transactions" ("T-T") is listed as a preferred method under 19 U.S.C. § 1677f-1(d)(1)(A), Commerce's regulations provide that the T-T methodology will rarely be employed by Commerce "such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made."  19 C.F.R. § 351.414(c)(2).

the A-T exception are met in a review, Commerce engages in the differential pricing analysis, which Commerce has used in recent investigations and reviews. See id.

In the preliminary results, Commerce stated that it employed the differential pricing analysis "pursuant to 19 CFR [§] 351.414(c)(1) and consistent with [19 U.S.C. § 1677f-1(d)(1)(B)]" and determined that the A-T comparison methodology was appropriate to apply to Devi Fisheries' and Falcon Marine's U.S. sales. See Prelim. I&D Memo at 5–7; see also Prelim. Results, 79 Fed. Reg. at 16,286. Commerce continued to apply the alternative A-T method to calculate Devi Fisheries' and Falcon Marine's dumping margins in the final results. See Final I&D Memo at 1–2; see also Final Results, 79 Fed. Reg. at 51,309.

Plaintiffs concede in their reply that JBF RAK LLC is determinative on the issue of whether Commerce has the authority to apply the alternative A-T method in reviews. See Pls.' Reply 3. The appellant in JBF RAK LLC, a manufacturer and exporter of polyethylene terephthalate film from the United Arab Emirates, appealed a U.S. Court of International Trade decision, see generally JBF RAK LLC v. United States, 38 CIT __, 991 F. Supp. 2d 1343 (2014), challenging Commerce's targeted dumping analysis and disputing Commerce's authority to apply A-T in the context of an administrative review. See JBF RAK LLC, 790 F.3d at 1360–62. The Court of Appeals for the Federal Circuit held that Commerce viewed its analysis in investigations as instructive for administrative reviews and reasonably exercised its gap-filling authority by using A-T to calculate dumping margins in administrative reviews in appropriate circumstances. See id. at 1364. In affirming Commerce's decision to apply A-T in the context of an administrative review,

the Court of Appeals for the Federal Circuit reasoned that "[t]he fact that the statute is

silent with regard to administrative reviews does not preclude Commerce from filling gaps

in the statute to properly calculate and assign antidumping duties." See id. at 1365

(internal quotations omitted).  Because the Court of Appeals for the Federal Circuit has

decided this very issue and the court is not presented with, nor does it observe, reasons

that warrant dissimilar treatment, the court holds that Commerce had the authority to

engage in an analysis to determine whether application of A-T was appropriate in this

administrative review.

## II.    Commerce Complied with its Regulations

Plaintiffs argue that while Commerce may apply A-T in reviews, it must comply

with its regulations codified at 19 C.F.R. § 351.414(f) (2008) here based on Plaintiffs'

position that those regulations were in full force and effect for this review.[7]  See Pls.' Mot.

---

[7] In 2008, following two notices requesting comments on how Commerce should address targeted dumping in antidumping duty investigations, see Targeted Dumping in Antidumping Investigations, 72 Fed. Reg. 60,651, 60,651 (Dep't Commerce Oct. 25, 2007); Proposed Methodology for Identifying and Analyzing Targeted Dumping in Antidumping Investigations, 73 Fed. Reg. 26,371, 26,371–72 (Dep't Commerce May 9, 2008), Commerce issued a notice that purportedly withdrew the regulations pertaining to the previous targeted dumping analyses used in antidumping duty investigations.  See generally Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations, 73 Fed. Reg. 74,930 (Dep't Commerce Dec. 10, 2008).  Specifically, Commerce announced the withdrawal of 19 C.F.R. § 351.414(f) and (g) (2008), the former of which includes the limiting rule and the allegation requirement.  See Withdrawal of the Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations, 73 Fed. Reg. 74,930 (Dep't Commerce Dec. 10, 2008). Following Commerce's 2008 withdrawal notice, an exporter challenged the withdrawal in the U.S. Court of International Trade claiming that the withdrawal was ineffective because Commerce did not comply with the APA's notice and comment requirements.  See Gold East Paper (Jiangsu) Co. v. United States, 37 CIT __, __, 918 F. Supp. 2d 1317, 1325 (2013).  The court in Gold East Paper agreed and explained that "[b]ecause Commerce failed to provide notice

(footnote continued)

15–18.  Specifically, Plaintiffs argue that Commerce must comply with the "limiting rule"[8]

and the "allegation requirement."[9]  See id.; see also 19 C.F.R. § 351.414(f)(2)–(3) (2008).

Plaintiffs contend that these regulatory provisions apply here because "[a]lthough

Commerce's [targeted dumping] regulations are, by their own terms, limited to

*investigations*, Commerce consistently relies on its [targeted dumping] investigation

policies in [antidumping duty] reviews."  Pls.' Mot. 16.

Defendant disagrees with Plaintiffs' contention because, regardless of whether the

regulations were properly withdrawn, "the regulations by their explicit terms applied to

*investigations* and not administrative reviews."  Def.'s Resp. 14.  Defendant also argues

that Commerce promulgated those regulations to implement the statutory provision in 19

U.S.C. § 1677f-1(d)(1) and there is no corresponding statutory directive with respect to

reviews.  See id. at 16.  Defendant-Intervenor adds that the regulations have since been

revoked and nonetheless applied to the preceding targeted dumping analysis rather than

---

and comment before withdrawing the Limiting Rule, . . . the court finds that the repeal of the regulation was invalid and the Limiting Rule is still in force."  Gold East Paper, 918 F. Supp. 2d at 1327.

　　　In response to the court's decision in Gold East Paper, Commerce, notwithstanding its position that the 2008 withdrawal notice was proper, made a subsequent attempt to withdraw 19 C.F.R. § 351.414(f) (2008) and stated that Commerce will not apply the regulation, including the limiting rule and the allegation requirement, in antidumping duty investigations.  See Non-Application of Previously Withdrawn Regulatory Provisions Governing Targeted Dumping in Antidumping Duty Investigations, 79 Fed. Reg. 22,371, 22,371–72 (Dep't Commerce Apr. 22, 2014).

[8] The limiting rule provides that if in an investigation Commerce identifies a pattern of export prices that differ significantly among purchasers, regions, or periods of time, Commerce "normally will limit the application of [A-T] to those sales that constitute targeted dumping under (f)(1)(i) of this section."  19 C.F.R. § 351.414(f)(2) (2008).

[9] The allegation requirement provides that Commerce "normally will examine only targeted dumping described in an allegation."  19 C.F.R. § 351.414(f)(3) (2008).

the differential pricing analysis that was undertaken here.  <u>See</u> Def.-Intervenor's Resp. 15–16.

Plaintiffs' argument is predicated upon the view that the regulation was in full force and effect for this proceeding.  To support that view, Plaintiffs argue that the attempted withdrawal in 2008 was invalid according to <u>Gold East Paper (Jiangsu) Co. v. United States</u>, 37 CIT __, 918 F. Supp. 2d 1317 (2013).  <u>See</u> Pls.' Mot. 15–16.  Plaintiffs further argue that the validity of the subsequent withdrawal in 2014 is irrelevant because it was applicable to cases initiated on or after May 22, 2014, whereas the instant review was initiated before that date.  <u>See</u> Pls.' Mot. 16 n.3.  Defendant holds fast to its view that despite the decision in <u>Gold East Paper</u>, the regulations were properly withdrawn in 2008.  However, whether the regulation was in full force and effect is of no consequence here.

The regulatory provisions that Plaintiffs argue Commerce failed to comply with do not apply to administrative reviews.  The issue of whether the regulations were properly withdrawn is not before the court as the regulations by their terms only apply to investigations, which Plaintiffs concede in their argument.  <u>See</u> Pls.' Mot. 16 (conceding that "Commerce's [targeted dumping] regulations are, by their own terms, limited to *investigations*"); <u>see also</u> 19 C.F.R. § 351.414(f) (2008).  Thus, there is no regulation that expressly requires Commerce to apply the limiting rule and the allegation requirement in a review.

Further, the regulations have not otherwise been implemented as part of Commerce's current practice in reviews.  As previously explained, Congress has not provided for when and how Commerce is to calculate dumping margins using A-T in

reviews.   Consequently, Commerce has developed a practice in administrative reviews of conducting an analysis that is guided by its approach in investigations to "examine[] whether to use the [A-T] method as an alternative comparison method."   Prelim. I&D Memo at 5.

Where Commerce has developed a practice it must follow that practice or explain why in a given case it was reasonable to deviate from that practice.   See NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1328 (Fed. Cir. 2009).   However, Commerce has decided from the outset not to incorporate the regulations as part of its practice of using the differential pricing analysis in reviews for the same reasons why it sought to withdraw the regulations altogether.   Commerce explained that "the regulation was impeding the development of an effective remedy for masked dumping," which Congress has charged Commerce to counteract by authorizing it to use A-T to calculate dumping margins under appropriate circumstances.   See Final I&D Memo at 14.   Commerce further provided that the regulations were "promulgated without the benefit of any experience on the issue of targeted dumping" and "prevented the use of this comparison methodology to unmask dumping."   Id. at 14.   Thus, Commerce ultimately decided to withdraw the regulation because it "may have had the unintentional effect of preventing the Department from employing an appropriate remedy to unmask dumping" and "[s]uch an effect would have been contrary to congressional intent" as it would seemingly deny domestic producers the relief the antidumping duty scheme envisions for them.   Id. at 16.   Commerce's reasons for withdrawing, or attempting to withdraw, the regulations suffice to demonstrate

that it has not adopted the regulations as a matter of practice in its differential pricing analysis.[10]

Plaintiffs, however, maintain that "Commerce itself has made its [targeted dumping] regulations relevant in [antidumping duty] *reviews*, and it must comply with them or explain why it is reasonable not to do so in this case." Pls.' Mot. 16.  At oral argument, Plaintiffs argued that Commerce's practice in reviews has incorporated the regulations applicable to investigations because its practice consistently relies upon the analysis used in investigations.  See Oral Arg., 03:28–04:41, Dec. 11, 2015, ECF No. 62.  However, as explained above, Commerce has not adopted the regulations as part of its practice of using the differential pricing analysis in reviews.  The fact that Commerce looks to its approach in investigations as guidance for its practice in reviews does not mean that Commerce has made a wholesale adoption of every aspect, including statutory and regulatory constraints, of its approach in investigations.  Although Commerce is permitted to extend particular statutory or regulatory provisions in other contexts, see JBF RAK LLC, 790 F.3d at 1364 (holding that Commerce's application of A-T in reviews in a manner that mirrors investigations is a reasonable exercise of its gap-filling discretion), it is by no

---

[10] The court recognizes that Commerce has put the allegation requirement into practice in past reviews.  See, e.g., JBF RAK LLC, 790 F.3d at 1361–62.  However, the fact that Commerce assessed whether the use of A-T was appropriate in response to an allegation of targeted dumping in past reviews could only bind the agency with respect to its previous practice of using a targeted dumping analysis in reviews.  As explained in the court's discussion, Commerce has since changed its practice of using a targeted dumping analysis to a differential pricing analysis for determining whether to apply A-T in a given case and has decided not to apply the limiting rule and the allegation requirement in its current practice.

means obligated to do so.  Therefore, Commerce was not required to comply with the limiting rule and the allegation requirement in the final results.

### III. Commerce's Change in Practice Did Not Trigger APA Rule Making Requirements

Plaintiffs contend that Commerce implemented its differential pricing analysis without following APA rule making requirements.  See Pls.' Mot. 18–20.  Defendant and Defendant-Intervenor explain that Commerce's shift from the Nails test[11] to the differential pricing analysis was a change in Commerce's practice rather than a rule and thus exempt from the APA's notice and comment rule making requirement.  See Def.'s Resp. 17–21; Def.-Intervenor's Resp. 17–18.   The court rejects Plaintiffs' argument based on fundamental administrative law principles.

Absent statutory restraints, agencies are generally free to develop policy through either rulemaking or adjudication.  SEC v. Chenery, 332 U.S. 194, 202 (1947).  Courts will not impose more procedures than those imposed by Congress or the agency.  Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 524–525 (1978).  Commerce is free to develop its approach for determining which comparison method to use in a given case through adjudication.

---

[11] The Nails test, which derives its name from the cases in which it was first used, was established in 2008 in concurrent antidumping duty investigations as a methodology to address the criteria under 19 U.S.C. § 1677f-1(d)(1)(B) and was the predecessor to Commerce's recently implemented differential pricing analysis.  See Certain Steel Nails from the People's Republic of China, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008) (final determination of sales at less than fair value); Certain Steel Nails From the United Arab Emirates, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008) (notice of final determination of sales at not less than fair value).

Nonetheless, Plaintiffs reason that the APA mandates notice and comment rulemaking pursuant to 5 U.S.C. § 553 because the differential pricing methodology is a "rule," which is defined as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency."  See Pls.' Mot. 19–20; 5 U.S.C. § 551(4).   However, the APA's notice and comment requirement applies to legislative rules and does not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice."[12]  See 5 U.S.C. § 553(b)(A).  While not binding on this Court, the court notes that the Court of Appeals for the D.C. Circuit has aptly addressed how to determine whether an agency rule is a legislative rule that must undergo notice and comment rulemaking by asking the following:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer

---

[12] Although the distinction between legislative rules, interpretive rules, and statements of policy may not always be obvious, the court notes that the Attorney General's Manual on the Administrative Procedure Act (1947), provides

> the following working definitions . . . : *Substantive rules*--rules, other than organizational or procedural under section 3(a)(1) and (2), issued by an agency pursuant to statutory authority and which implement the statute, as, for example, the proxy rules issued by the Securities and Exchange Commission pursuant to section 14 of the Securities Exchange Act of 1934 (15 U.S.C. 78n). Such rules have the force and effect of law.

> *Interpretative rules*--rules or statements issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.

> *General statements of policy*--statements issued by an agency to advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power.

Attorney General's Manual on the Administrative Procedure Act (1947), at 30 n.3 (internal citations omitted).

benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

Am. Mining Cong. v. Mine Safety Admin., 995 F.2d. 1106, 1112 (D.C. Cir 1993).  Adopting this framework, none of the questions raised are answered affirmatively in this context. Congress has afforded Commerce the basis for agency action absent any rulemaking. Commerce's approach to uncovering dumping has developed, and continues to develop, over time as foreshadowed by the Supreme Court in Chenery. [13]

---

[13]  The earliest variation of Commerce's approach to address the criteria under 19 U.S.C. § 1677f-1(d)(1)(B) was the Pasta test from Commerce's first encounter with targeted dumping. See generally Certain Pasta From Italy, 61 Fed. Reg. 30,326 (Dep't Commerce June 14, 1996) (notice of final determination of sales at less than fair value), as amended, 61 Fed. Reg. 38, 547 (Dep't Commerce June 14, 1996), as amended 61 Fed. Reg. 42,231 (Dep't Commerce Aug. 14, 1996); see also Borden, Inc. v. United States, 23 CIT 372, 373 (1999).  After Certain Pasta From Italy, Commerce was presented with allegations of targeted dumping in two other proceedings, but Commerce ultimately found that the allegations were inadequate and did not proceed with a targeted dumping analysis.  See generally Fresh Tomatoes From Mexico, 61 Fed. Reg. 56,608 (Nov. 1, 1996) (notice of preliminary determination of sales at less than fair value and postponement of final determination); Stainless Steel Wire Rod from Taiwan, 63 Fed. Reg. 10,836 (March 5, 1998) (notice of preliminary determination of sales at less than fair value and postponement of final determination).

Commerce's use of the Pasta test was short-lived and limited to the antidumping duty investigation of certain pasta from Italy because Commerce adopted the "P/2 test" when it next engaged in a targeted dumping analysis in Coated Free Sheet Paper from the Republic of Korea, 72 Fed. Reg. 60,630 (Dep't Commerce Oct. 25, 2007) (notice of final determination of sales at less than fair value).  Commerce recognized the need for a standardized approach with regard to targeted dumping and filed a notice immediately following its determination in Coated Free Sheet Paper from the Republic of Korea requesting comments on developing a methodology for its targeted dumping determination in investigations.  See Targeted Dumping in Antidumping Investigations; Request for Comment, 72 Fed. Reg. 60,651, 60,651 (Dep't Commerce Oct. 25, 2007).

In 2008, Commerce began using what is now known as the Nails test in investigations to determine if a foreign exporter or producer is engaging in targeted dumping.  See generally Certain Steel Nails From the People's Republic of China, 73 Fed. Reg. 33,977 (Dep't Commerce June 16, 2008) (final determination of sales at less than fair value); Certain Steel Nails From the

(footnote continued)

Because Commerce's approach has and continues to evolve, it is not appropriate to "rigidify[] [Commerce's] tentative judgment into a hard and fast rule." <u>Chenery</u>, 332 U.S. at 202.  Commerce's approach for determining whether to utilize the A-T exception is precisely the type of situation where the agency "retain[s] power to deal with the problems on a case-to-case basis . . . [allowing for] the case-by-case evolution of statutory standards." <u>Id.</u> at 203.  Thus, Commerce's shift from the <u>Nails</u> test to the differential pricing analysis is not subject to notice and comment requirements.

Plaintiffs additionally argue that by requesting comments on the differential pricing analysis Commerce acknowledged that the change is subject to APA notice and comment requirements.  <u>See</u> Pls.' Mot. 19 n.5; <u>see also</u> <u>Differential Pricing Analysis; Request for Comments</u>, 79 Fed. Reg. 26,720, 26,720 (Dep't Commerce May 9, 2014) ("<u>Request for Comments</u>").  Plaintiffs' assertion is erroneous.  By simply requesting comment, Commerce did not in effect obligate itself to engage in notice and comment rule making. Commerce has not invoked its legislative authority simply by seeking input from interested parties.

---

<u>United Arab Emirates</u>, 73 Fed. Reg. 33,985 (Dep't Commerce June 16, 2008) (notice of final determination of sales at not less than fair value); <u>see also</u> <u>Mid Continent Nail Corp. v. United States</u>, 34 CIT 512, 513–15, 712 F. Supp. 2d 1370, 1372–74 (2010).  For several years Commerce continued to utilize the <u>Nails</u> test to help decide whether the statutory preconditions are satisfied to employ A-T.

On March 4, 2013, Commerce made its most recent development to its approach, departing from its previous targeted dumping analysis, and first used what Commerce has coined the "differential pricing analysis" in the antidumping duty investigation of xanthan gum from the People's Republic of China.  <u>See</u> <u>Xanthan Gum From the People's Republic of China</u>, 78 Fed. Reg. 33,351, 33,351–52 (Dep't Commerce June 4, 2013) (final determination of sales at less than fair value).

Plaintiffs further argue that "Commerce arbitrarily changed from its so-called *Nails Test* to its new [differential pricing] analysis without adequate explanation or input." Pls.' Mot. 19. Plaintiffs are correct in that Commerce must adequately explain any changes to its practice to be entitled to deference. See SKF USA Inc. v. United States, 630 F.3d 1365, 1373 (Fed. Cir. 2011); see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 48–49 (1983) (explaining that "an agency must cogently explain why it has exercised its discretion in a given manner"); Nippon Steel Corp. v. U.S. Int'l Trade Comm'n, 494 F.3d 1371, 1378 n.5 (Fed. Cir. 2007) (providing that "[w]hen an agency decides to change course, however, it must adequately explain the reason for a reversal of policy" to be afforded deference). However, the court finds that Commerce has provided an adequate explanation for its change in practice and sought input from interested parties.

Commerce's explanation for the shift from the Nails test to the differential pricing analysis need not confirm that the change is a better policy or methodology than its predecessor. See FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." Id. "Thus, Commerce need only show that its methodology is permissible under the statute and that it had good reasons for the new methodology." Huvis Corp. v. United States, 570 F.3d 1347, 1353 (Fed. Cir. 2009).

Commerce explained that it continues to develop its approach with respect to the use of A-T "as it gains greater experience with addressing potentially hidden or masked

dumping that can occur when the Department determines weighted-average dumping margins using the [A-A] comparison method."  Final I&D Memo at 18 (internal quotations omitted).  Commerce additionally explained that the new approach is "a more precise characterization of the purpose and application of [19 U.S.C. § 1677f-1(d)(1)(B)]" and is the product of Commerce's "experience over the last several years, . . . further research, analysis and consideration of the numerous comments and suggestions on what guidelines, thresholds, and tests should be used in determining whether to apply an alternative comparison method based on the [A-T] method."  Request for Comments, 79 Fed. Reg. at 26,722.  Commerce developed its approach over time, while gaining experience and obtaining input. Under the standard described above, Commerce's explanation is sufficient. Therefore, Commerce's adoption of the differential pricing analysis was not arbitrary.

## IV.    Differential Pricing Analysis

The statute provides that Commerce must compare normal value to the export price of each entry of subject merchandise in order to calculate dumping margins.  See 19 U.S.C. § 1675(a)(2)(A)(ii); 19 U.S.C. § 1677b(a); 19 U.S.C. § 1677(35)(A).  However, the statute does not dictate which comparison methodology Commerce must use in a review, nor when it may use A-T in a review.  Commerce has stated in its regulations that it will apply A-A in reviews "unless another method is appropriate in a particular case."  19 C.F.R. § 351.414(c)(1).  Commerce has adopted a practice in reviews of using the differential pricing analysis based upon the statutory provision applicable to investigations

Case 1:14-cv-00226-CRK   Document 68   Filed 02/05/16   Page 23 of 57

to determine whether application of A-T is warranted.[14]   According to Commerce's practice, it may use A-T rather than A-A in a review when (1) there is a pattern of export prices that differ significantly among purchasers, regions, or periods of time and (2) Commerce provides an explanation for why the pattern of significant price differences cannot be taken into account using A-A.   Plaintiffs challenge (i) Commerce's use of weighted-average export prices to find prices that differ significantly, (ii) the inclusion of both higher and lower-priced sales in the analysis, (iii) Commerce's finding of a pattern of export prices that differ significantly, (iv) Commerce's explanation as to why A-A cannot account for such differences, and (v) Commerce's application of its mixed methodology.

---

[14] The statutory directive for investigations provides:

(B) Exception
[Commerce] may determine whether the subject merchandise is being sold in the United States at less than fair value by comparing the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise [(A-T)], if--

(i)     there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
(ii)    [Commerce] explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) [(A-A)] or (ii) [(T-T)].

19 U.S.C. § 1677f-1(d)(1)(B).  Commerce explained that "[a]lthough [19 U.S.C. § 1677f-1(d)(1)(B)] does not strictly govern the Department's examination of this question in the context of an administrative review, the Department nevertheless finds that the issue arising under 19 CFR [§] 351.414(c)(1) in an administrative review is analogous to the issue in . . . investigations. Accordingly, the Department finds the analysis that has been used in . . . investigations instructive for purposes of examining whether to apply an alternative comparison method in this administrative review."  Final I&D Memo at 9.  Commerce has thus adopted a practice to use an approach akin to the approach used in investigations, namely the differential pricing analysis, to determine whether to apply A-T in an administrative review.  See Final Modification, 77 Fed. Reg. at 8,102; see also Request for Comments, 79 Fed. Reg. at 26,722.

See Pls.' Mot. 20–45.[15]  Each of Plaintiffs' specific challenges to Commerce's differential pricing analysis are unavailing as explained below.

**A. Commerce's Analysis for Finding a Pattern of Export Prices that Differ Significantly is Reasonable.**

In the first stage of the differential pricing analysis, Commerce employs two tests — (1) the Cohen's d test and (2) the ratio test — to identify a pattern of export prices that differ significantly.  See Prelim. I&D Memo at 6–7.  The Cohen's d test assesses whether export prices differ significantly among purchasers, regions, or periods of time, whereas the ratio test evaluates whether the price differences measured by the Cohen's d test are sufficient to exhibit a pattern.  See id.; Request for Comments, 79 Fed. Reg. at 26,722. Plaintiffs argue Commerce's finding that the mandatory respondents' U.S. sales revealed a pattern of export prices that differ significantly among purchasers, regions, or time periods is unsupported by substantial evidence and not in accordance with law.  See Pls.' Mot. 20–28.  Plaintiffs argue Commerce improperly used averages to find significant price differences, see id. at 20–26, wrongly included higher-priced sales that passed the Cohen's d test in the ratio test, see id. at 43–45, and erroneously found a pattern of significant price differences.  See id. at 26–28.

---

[15] In articulating their specific challenges to Commerce's differential pricing analysis and responses thereto, Plaintiffs and Defendant sometimes allude to 19 U.S.C. § 1677f-1(d)(1)(B) as if the statute directly controls Commerce's determination in the instant review.  See, e.g., Pls.' Mot. 20, 21, 25, 28–29, 32, 35, 42; Def.'s Resp. 21, 25–26, 29, 31, 35.  The court notes that Commerce is directly constrained by the statute only in investigations.  Although Commerce's approach in reviews follows the language of the statute, Commerce is bound by its practice in reviews rather than the statute pertaining to investigations.

     i.    Commerce's Use of Averages in the Cohen's d Test

Plaintiffs argue that Commerce's use of weighted-average export prices as opposed to individual export prices in its Cohen's d analysis conflicts with the statute, is distortive, and lacks an adequate explanation. <u>See</u> Pls.' Mot. 21–26. Defendant explains that the statute does not restrict Commerce's discretion to use weighted-average export prices. <u>See</u> Def.'s Resp. 25–28.

The language of the statute, as implicated by Commerce's practice, requires Commerce to identify whether there is "a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time" before application of A-T is permitted. <u>See</u> 19 U.S.C. § 1677f-1(d)(1)(B)(i). The first stage of the differential pricing analysis answers this question by bifurcating the inquiry, <u>i.e.</u>, separately addressing whether there are significant price differences and whether those price differences are such that they constitute a pattern. Commerce uses the Cohen's d test to evaluate whether "the net prices [of comparable merchandise] to a particular purchaser, region, or period of time differ significantly from the net prices of all other sales of comparable merchandise." Prelim. I&D Memo at 6. To do so, Commerce preliminarily disaggregates the data collected from the individually examined respondents and sorts the sales of each CONNUM[16] into sales to particular purchasers, regions, and periods of time. <u>See</u> <u>id.</u> Each grouping of CONNUM sales specific to a purchaser, region, or time

---

[16] CONNUM is short for "control number" and is a product code consisting of a series of numbers reflecting characteristics of a product in the order of their importance used by Commerce to refer to particular merchandise. <u>See</u> Prelim. I&D Memo at 6; Def.'s Resp. 22–23.

period forms a test group and the remaining sales of that CONNUM to all other purchasers, regions, or time periods form a corresponding comparison group. See Final I&D Memo at 22.

Commerce performs the Cohen's d test by calculating the difference between the weighted-average sales prices of a test group and its corresponding comparison group, and subsequently comparing that difference in relation to the pooled standard deviation[17] of the two groups.[18]  See id. at 24.  The resulting value is known as the Cohen's d coefficient.  See id.  Commerce considers test group sales to pass the Cohen's d test if the resulting Cohen's d coefficient is equal to or greater than 0.8, which Commerce deems to be a strong indication of significant price differences.  See Prelim. I&D Memo at 6. Conversely, Commerce views a Cohen's d coefficient value less than 0.8 as an indication that the price differences are not significant.  See id.  Each CONNUM's sales undergo several rounds of analysis to assess whether the export prices differ significantly by way of sales to particular purchasers, regions, or time periods.  See generally Devi Fisheries' Prelim. Calcs.; Falcon Marine Prelim. Calcs.; see also Prelim. I&D Memo at 6.  If the weighted-average sales price of a test group pass any of the rounds of the Cohen's d test, then all the sales within that test group are considered to have passed the Cohen's d test as a whole.  See Devi Fisheries' Prelim. Calcs. at 84–85; Falcon Marine Prelim.

---

[17] A pooled standard deviation is a composite value representing the variance between multiple data sets, which in this case are the sales prices of the test group and the comparison group. See Final I&D Memo at 24.

[18] Commerce only conducts the Cohen's d test if: (1) the test group and its corresponding comparison group each have at least two transactions, and (2) the quantity of sales that make up the comparison group must account for at least five percent of the total quantity of sales of comparable merchandise.  See Prelim. I&D Memo at 6.

Calcs. at 52. Thus, Commerce uses the Cohen's d test to assess whether a respondent's export prices differ significantly with respect to particular purchasers, regions, or periods of time.

Congress has granted Commerce considerable discretion to construct a methodology to apply in a review. Further, the court affords Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature." Fujitsu General Ltd. v. United States, 88 F.3d 1034, 1039 (Fed. Cir. 1996). Despite its wide discretion, Commerce "must cogently explain why it has exercised its discretion in a given manner," State Farm, 463 U.S. at 48–49, and the methodological approach must nevertheless be a "reasonable means of effectuating the statutory purpose" and its conclusions must be supported by substantial evidence in order to be afforded deference.[19] Ceramica Regiomontana, S.A. v. United States, 10 CIT 399, 404–05, 636 F. Supp. 961, 966 (1986), aff'd, 810 F.2d 1137, 1139 (Fed. Cir. 1987).

Here, Commerce has reasonably exercised its discretion and considered weighted-average export prices in the Cohen's d test. Neither the statute nor

---

[19] Here, Commerce has adopted a practice based upon the statutory directive for investigations, which requires the court to review Commerce's methodological approach for its reasonableness. However, Commerce is afforded significant deference even in the case of an investigation to implement the statutory directive because Congress has likewise not provided for how Commerce should determine whether application of A-T is appropriate. Specifically, Congress has not specified how Commerce is to discern "a pattern of export prices that differ significantly" or what form of "export prices" Commerce must consider in its pattern analysis. See 19 U.S.C. § 1677f-1(d)(1)(B)(i). Thus, in an investigation, the statute leaves it to Commerce's discretion to fill the gap and choose to either use weighted-average export prices or export prices of individual transactions so long as it is reasonable. See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 843–44 (1984); Torrington Co. v. United States, 82 F.3d 1039, 1044 (Fed. Cir. 1996) ("Any reasonable construction of the statute is a permissible construction."); see also 19 U.S.C. § 1677f-1(d)(1)(B)(i).

Commerce's practice require it to identify significant price differences through the use of individual export prices rather than weighted-average export prices.   Commerce reasonably determines whether export prices differ significantly among purchasers, regions, or time periods by evaluating the relative difference between the weighted-averages of two subgroups of sales.  As described above, the test group is comprised of sales to a particular purchaser, region, or time period, and the comparison group is comprised of sales to the other purchasers, regions, or time periods outside of the test group.   Commerce then calculates the weighted-average of the export prices that comprise each of these groups and if the difference between the weighted-averages reaches a certain level, Commerce finds that the price differences are significant.  The court can discern from Commerce's explanation that export prices differ significantly among purchasers (or regions or time periods) where Commerce observes significant price differences between the weighted-average of sales to a particular purchaser (or region, or time period) and the weighted-average of sales to all other purchasers (or regions, or time periods).   The court finds the use of weighted-average export prices reasonable in this case.  Significant price differences between the weighted-averages of export prices reasonably indicate that export prices differ significantly because the analysis "uses all of a respondent's reported U.S. sales of subject merchandise" and the weighted-averages are therefore representative of and account for all the export prices. Final I&D Memo at 34.  Commerce's approach is thus able to effectuate the purpose of the analysis.  While it may be possible in some situations that significant differences in the weighted-averages of export prices would not be indicative that the export prices of

individual transactions differ significantly, there is no record evidence to suggest that is the case here.  To show that Commerce's use of weighted-averages was improper here, Plaintiffs must demonstrate that Commerce's use of weighted-averages identified significant price differences where such price differences would not be found to be significant through use of individual export prices. Plaintiffs have not demonstrated that the case here is as such.

Plaintiffs' text-based arguments do not stand up to scrutiny.  To support its position, Plaintiffs claim that the language under 19 U.S.C. § 1677f-1(d)(1)(B)(i) as implicated in Commerce's practice, "a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time," suggests that Congress intended that the requisite pattern finding must be based on individual export prices. See Pls.' Mot. 21–22. Plaintiffs emphasize that the word "differ" in the statute is plural, so they argue that the word is meant to relate to "export prices" rather than to "pattern." See id. At oral argument, Plaintiffs maintained that Commerce should instead conduct the Cohen's d test using export prices of individual transactions in the test group and weighted-average export prices in the comparison group. See Oral Arg., 32:00–32:33.

Even accepting Plaintiffs' assertion that the word "differ" modifies "export prices" does not lead to the conclusion that Commerce must use export prices of individual transactions rather than weighted-average export prices.  Although Congress did not modify "export prices" with "weighted-average" in the statute, Congress similarly decided not to modify "export prices" with "individual transactions" as it had done in other provisions of the antidumping duty statute. Compare 19 U.S.C. § 1677f-1(d)(1)(A)(i) and

19 U.S.C. § 1677f-1(d)(1)(B) <u>with</u> 19 U.S.C. § 1677f-1(d)(1)(B)(i).   Moreover, even if Congress intended for Commerce to establish that individual export prices differ significantly, it is not unreasonable for Commerce to fulfill that goal by looking to averages. Plaintiffs fail to demonstrate why Commerce's choice is unreasonable.[20]

Plaintiffs also assert that Commerce's use of averages in its Cohen's d calculations distorts the differential pricing analysis.  <u>See</u> Pls.' Mot. 23–25.  Plaintiffs argue that by using weighted-average export prices, Commerce masks individual sales prices and "smooth[s] out differences in individual export prices."  <u>Id.</u>  Averaging prices by definition smooths out differences in individual prices.  However, smoothing out differences is not necessarily distortive where Commerce is called upon to determine whether there is a pattern of prices that differ significantly.  To show distortion in this context, the relevant question is whether the use of averages reveals significant price differences (or fails to reveal significant price differences) that would not be identified (or would be) without the use of averaging.  Plaintiffs fail to make such a showing.

---

[20] At oral argument, Plaintiffs further reasoned that because Congress has not directed Commerce which type of export prices to consider, Congress clearly intended for the default definition for export price to apply, which is found under 19 U.S.C. § 1677a(a).  <u>See</u> Oral Arg., 24:49–25:37.  Section 1677a(a) defines export price as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States."  19 U.S.C. § 1677a(a).  Plaintiffs argue that this definition requires Commerce to look at the actual export prices.  However, nothing in Congress's definition for export price advances Plaintiffs' argument. This statutory provision does not stand for the proposition that Commerce is required to use export prices of individual transactions rather than weighted-average export prices in its practice for reviews.

Plaintiffs alternatively argue that Commerce must use monthly weighted-average export prices instead of annual or quarterly weighted-average export prices.  See id. at 26.  For evaluating sales to purchasers and regions for differential pricing, Commerce uses annual weighted-average sales prices in the test groups and comparison groups. See Def.'s Resp. 22; Prelim. I&D Memo at 6.  For evaluating sales in certain periods of time for differential pricing, Commerce uses quarterly weighted-average sales prices in the test groups and comparison groups.  See Def.'s Resp. 23; Prelim. I&D Memo at 6. Plaintiffs argue that Commerce should instead use monthly weighted-average export prices because "[l]arger averaging period[s] tend[] to amplify distortions."  See Pls.' Mot. 26.  Plaintiffs ground their argument in Commerce's regulations which require it to use monthly weighted-averages when applying A-A in reviews.  See 19 C.F.R. § 351.414(d)(3).

The court is unconvinced.  Plaintiffs fail to show why the use of monthly averages is either required by the statute or regulation, or why the use of annual or quarterly averages is unreasonable.  Commerce's regulation instructs Commerce to apply A-A in reviews as follows:

> (d) Application of the average-to-average method—
> . . .
>> (3) Time period over which weighted average is calculated. . . . When applying the average-to-average method in a review, [Commerce] normally will calculate weighted averages on a monthly basis and compare the weighted-average monthly export price or constructed export price to the weighted-average normal value for the contemporaneous month.

19 C.F.R. § 351.414(d)(3).   Plaintiffs' argument misunderstands the function of the differential pricing analysis.   The regulation cited by Plaintiffs is inapplicable in this context because it refers to Commerce's use of averages in using the A-A comparison methodology to calculate dumping margins.   The differential pricing analysis provides Commerce with a method to identify if a respondent's sales exhibit a pattern of significant price differences, not calculate dumping margins.   The regulation in no way restricts the time period over which Commerce calculates the weighted-averages it uses for purposes of finding significant price differences.

Finally, Plaintiffs argue that Commerce has not adequately explained that its use of weighted-averages in the Cohen's d test is consistent with 19 U.S.C. § 1677f-1(d)(1)(B)(i).   See Pls.' Mot. 25–26.   Commerce explained "neither the statute nor the regulations specify how the Department should examine whether there exists a pattern of prices that differ significantly" and therefore its use of weighted-averages is reasonable in light of that silence.   See Final I&D Memo at 23.   While Commerce's explanation could more completely articulate its rationale, Commerce's path is reasonably discernable.   It is within Commerce's discretion to determine how to identify significant price differences.   Commerce has found that the use of weighted-averages is able to reasonably accomplish its intended purpose of identifying significant price differences. See id. at 22–23.   As stated above, Commerce reasonably concludes that export prices differ significantly among purchasers, regions, or time periods where it observes significant price differences between the weighted-average of test group sales and the weighted-average of comparison group sales.   Implicit in Commerce's explanation is that

significant price differences between the weighted-averages of export prices indicates whether the export prices differ significantly.  Further, Commerce relies upon its prior use of weighted-averages in its application of the Nails test and found that to be reasonable and appropriate.  See id.  Plaintiffs are unable to demonstrate why the use of weighted-averages is unreasonable and unable to identify significant price differences.  Although Commerce's explanation is not ideal, it is adequate.

Therefore, Commerce's use of annual and quarterly weighted-averages in the Cohen's d test to discern significant price differences is reasonable.

ii.   Commerce's Consideration of All Sales in the Ratio Test

Plaintiffs claim that Commerce must limit the ratio test to "lower priced" sales that pass the Cohen's d test in order to comply with the statute.  See Pls.' Mot. 43–45. Plaintiffs argue "Commerce wrongly included 'higher' priced sales (i.e., sales with prices above the 'mean') in determining which sales 'pass' Cohen's d under the first step 'pattern' stage of its [differential pricing] analysis."  Pls.' Reply 27.  In response, Defendant reiterates Commerce's rationale for considering all sales explaining that Commerce was not required to limit its analysis because "'higher-priced sales are equally capable as lower-priced sales of creating a pattern of prices that differ significantly.'" [21]  Def.'s Resp. 30 (quoting Final I&D Memo at 26).

---

[21] In Plaintiffs' Rule 56.2 motion it is not clear whether Plaintiffs are challenging Commerce's consideration of higher priced sales as part of the Cohen's d test, or the inclusion of higher priced sales that pass the Cohen's d test as part of the ratio test, i.e., the first or the second test in the first stage of the differential pricing analysis.  See Pls.' Mot. 43.  Because Defendant understood

(footnote continued)

Before Commerce may apply A-T to calculate a respondent's dumping margin, Commerce's practice in reviews requires that it first determine whether that respondent's sales exhibit a pattern of export prices that differ significantly among purchasers, regions, and periods of time.  As stated previously, Commerce answers this question by separately addressing whether there are significant price differences and whether those price differences are such that they constitute a pattern.  For the second prong of the inquiry, made relevant by Plaintiffs' claim here, Commerce applies the ratio test, which "assesses the extent of the significance of the price differences for all sales as measured by the Cohen's d test" by comparing the combined value of the respondent's U.S. sales that passed the Cohen's d test in relation to the value of all U.S. sales.  See Prelim. I&D Memo at 6.

To discern whether the sales passing the Cohen's d test constitute a pattern, Commerce has devised the ratio test to categorize a respondent's pricing behavior. Commerce has chosen to consider all sales, regardless of whether they are higher or lower-priced sales, to evaluate the extent of the differentially priced sales.  Commerce explained that all sales are relevant to its analysis because "[h]igher-priced sales and lower-priced sales do not operate independently . . . . Higher- or lower-priced sales could

---

Plaintiffs' argument as asserting that Commerce was obligated to limit the application of the Cohen's d test to export prices "that reflect the 'mean of comparable merchandise' or lower," Defendant responds by explaining that Commerce properly considered all export prices in its Cohen's d calculations because "'higher-priced sales are equally capable as lower-priced sales of creating a pattern of prices that differ significantly.'"  Def.'s Resp. 30 (quoting Final I&D Memo at 26).  At oral argument, Plaintiffs clarified that its argument is that Commerce improperly considered sales priced higher than the mean in the ratio test.  See Oral Arg., 1:03:10–1:03:42. While it remains unclear which "mean" Plaintiffs refer to, it is inconsequential because it has no bearing on the court's decision on this issue.

be dumped or could be masking other dumped sales . . . . By considering all sales, both higher-priced and lower-priced, the Department is able to analyze an exporter's pricing behavior and to identify whether there is a pattern of prices that differ significantly."  Final I&D Memo at 26.   This practice is based upon a methodological approach that is reasonable and has been adequately explained.  See State Farm, 463 U.S. at 48–49 ("[A]n agency must cogently explain why it has exercised its discretion in a given manner."); Fujitsu General Ltd., 88 F.3d at 1039 (granting Commerce significant deference in determinations "involv[ing] complex economic and accounting decisions of a technical nature"); Ceramica Regiomontana, S.A., 636 F. Supp. at 966, aff'd, 810 F.2d at 1139 (affording deference to Commerce's methodology so long as it reasonably effectuates the statutory purpose and is supported by substantial evidence).  Commerce's practice in reviews requires it to identify a pattern of export prices that differ significantly among purchasers, regions, or periods of time.  The inquiry is not limited to lower-priced export prices.  It is appropriate for Commerce to consider all sales in its analysis because, in determining whether A-T is appropriate, Commerce is required to uncover significant differences in a respondent's export prices, which necessarily calls for looking at the differences in higher and lower-priced sales to assess whether those differences are in fact significant.  Considering all sales allows Commerce to fully assess the breadth of a respondent's price differences.  Thus, it is reasonable to examine all of a respondent's sales in its differential pricing analysis.

Nonetheless, Plaintiffs argue that Commerce "improperly increase[d] the pool of sales to which Commerce applies its alternative A-T methodology" by "includ[ing] all sales

that 'passed' the Cohen's d test, regardless of whether the sales were priced higher or lower than sales in the test group." Pls.' Mot. 43. Plaintiffs argue that Commerce should only consider lower-price sales that pass the Cohen's d test "for purposes of determining the 33/66 test" in order to be consistent with the statutory scheme. Id. at 45. Plaintiffs base their argument on the notion that Commerce must limit its analysis to dumped sales.

Plaintiffs' argument is inapposite because it misconstrues the function of the test that Commerce has established. All sales are subject to the differential pricing analysis because its purpose is to determine to what extent a respondent's U.S. sales are differentially priced, not to identify dumped sales. See Final I&D Memo at 25–26. Commerce is not restricted in what type of sales it may consider in assessing the existence of such a pattern so long as its methodological choice enables Commerce to reasonably determine whether application of A-T is appropriate. See 19 C.F.R. § 351.414(c)(1).

Plaintiffs' reliance on legislative history to support their argument is unavailing. See Pls.' Mot. 43 (citing Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 843 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4178 ("SAA")). Plaintiffs assert that, according to the SAA, "the whole point of Commerce's [differential pricing] analysis and A-T remedy is to combat 'targeted dumping.'" Id. Plaintiffs yet again fail to recognize that the subject of Commerce's inquiry is differentially priced sales, not dumped sales. See Final I&D Memo at 25–26. Contrary to Plaintiffs' argument, the SAA also explains "an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or

regions." SAA at 4177–78. Therefore, the SAA also supports the view that consideration of both lower and higher-priced sales may be appropriate in determining whether application of A-T is necessary to unmask dumping. For the reasons discussed above, Plaintiffs are unable to demonstrate that Commerce's decision to consider all sales in the ratio test was unreasonable.

     iii.    Commerce's Pattern Determination is Supported by Substantial Evidence

Because of the challenges discussed above, Plaintiffs argue that Commerce's finding that the mandatory respondents' U.S. sales exhibited a pattern of export prices that differ significantly among purchasers, regions, or time periods is not supported by substantial evidence. See Pls.' Mot. 26–28; Pls.' Reply 12–13. Plaintiffs insist that there is no particular reason why certain sales passed the Cohen's d test while other sales did not pass because "pricing differences among sales that 'passed' Cohen's d and those that failed were often minuscule." Pls.' Mot. 27. Defendant in response explains "that certain select prices that pass and fail the Cohen's *d* test are close in value does not mean that the differences between the sales, as well as the thousands of other sales, are not statistically significant." Def.'s Resp. 33.

The fact that the price differences between sales that pass and do not pass the Cohen's d test were at times small in absolute terms does not undermine Commerce's pattern determination. Indeed, "small differences may be significant for one industry or one type of product but not for another." Final I&D Memo at 24 (quoting SAA at 843). Commerce explained that its analysis has been developed to identify significant price differences depending on what is considered significant for a particular industry or

product.  See id.  "Specifically, the Cohen's *d* coefficient measures the significance of the

difference in the weighted-average sales price between the test and comparison groups

relative to the variances of the individual sales prices within each group."  Id.  Therefore,

Commerce's approach accounts for what degree of price differences is necessary to be

deemed significant by comparing sales prices in relation to the average price variation

between sales prices of a CONNUM, i.e., the test group and comparison group.  The

significance of the price difference is determined by the "variance[] of the individual sales

prices within each group."  Id.  "Thus, if there is little variance in prices among purchasers

in a particular industry, regions, or time periods, then small differences, in absolute terms,

may be significant.  On the other hand, if individual sale prices within each comparison

group . . . have a greater variability . . . [,] then there must be greater differences in the

weighted-average sale prices between the two groups for the difference to be significant."

Id.  The fact that the price differences among the sales passing and not passing the

Cohen's d test are insignificant in absolute terms does not mean that the relative

differences are not significant for purposes of identifying a pattern of significant price

differences.  Implicit in Commerce's approach is that the relative significance of the

differences is what matters.  Accordingly, Commerce's pattern determination is supported

by substantial evidence.

### B. Commerce Has Explained Why A-A Cannot Account for the Pattern of Significant Price Differences

Plaintiffs challenge Commerce's determination that A-A cannot account for the

pattern of significant price differences.  See Pls.' Mot. 28–36.  Defendant responds that

Commerce provided an adequate explanation by evaluating whether the differences in the A-A margin in comparison to the A-T margin are "meaningful." See Def.'s Resp. 34. Commerce has adequately explained why A-A cannot account for the pattern of significant price differences.

Once Commerce establishes that there is a pattern of significant price differences, Commerce's practice in reviews requires it to explain whether A-A cannot account for such price differences before deciding to apply A-T.[22]  Commerce has chosen to answer whether A-A cannot account for such price differences by engaging in its meaningful differences analysis, which is the second stage of the differential pricing analysis.  See Prelim. I&D Memo at 7; Final I&D Memo at 3, 22.  In its meaningful differences analysis, Commerce examines whether A-A can account for the significant price differences attributable to the subject sales that pass both the Cohen's d test and ratio test.  See Prelim. I&D Memo at 7.  To answer this inquiry, Commerce determines whether the A-T margin, calculated in the manner suggested by the preceding Cohen's d and ratio tests, yields a meaningful difference in comparison to the A-A calculated margin.  See id.  In

---

[22] The court acknowledges that the statute governing Commerce's authority to apply A-T in investigations conditions its use upon Commerce providing an explanation for why A-A and T-T cannot account for the observed pattern of significant price differences.  See 19 U.S.C. § 1677f-1(d)(1)(B)(ii).  However, Commerce's practice in reviews evidently differs from the statutory requirements in that regard because in reviews Commerce has only provided an explanation for why A-A cannot account for the significant price differences observed in the first stage of the differential pricing analysis.  Because Commerce is not bound by the statute, but rather, it is bound by its practice, and Plaintiffs apparently have not challenged Commerce's failure to explain why T-T cannot account for the pattern of significant price differences, the court does not opine on whether Commerce provided an adequate explanation for why T-T in addition to A-A cannot account for the significant price difference, as Commerce is required by statute in an investigation.

other words, Commerce's meaningful difference analysis calls for a comparison of margins calculated by applying A-A and A-T in the manner suggested by the ratio test. See id. Commerce finds a meaningful difference in the calculated margins if (1) the A-T calculated margin crosses the de minimis threshold while the A-A calculated margin remains de minimis, or, (2) if both calculated margins are above de minimis, the A-T calculated margin is 25% greater than the A-A calculated margin.[23]  See id.  If such a finding is made, Commerce proceeds to apply A-T as dictated by the first stage of the analysis to calculate the respondent's antidumping duty rate.   See id.  Put simply, Commerce finds that A-A cannot account for the significant price differences if there is a meaningful difference between the A-A calculated margin as compared to the A-T calculated margin.  See id.; Final I&D Memo at 3, 22.

Here, Commerce calculated a margin of 0.00% for both respondents when using A-A, however, it calculated a margin of 1.97% for Devi Fisheries and 3.01% for Falcon Marine when using A-T as directed by the ratio test.  See Devi Fisheries' Prelim. Calcs. at 2; Falcon Marine's Prelim. Calcs. at 2.  Thus, Commerce determined that the A-A method could not account for the significant price differences among the mandatory respondents' U.S. sales because the A-T calculated margin resulted in a meaningful difference in relation to the A-A calculated margin.  See Devi Fisheries' Prelim. Calcs. at 1–2; Falcon Marine's Prelim. Calcs. at 1–2.  For Devi Fisheries, Commerce explained that

---

[23] Because the latter is not implicated in this case, the court's discussion is limited to assessing whether Commerce's conclusion in the second stage of the differential pricing analysis, that application of A-T was appropriate here because the A-T calculated margin crossed the de minimis threshold while the A-A calculated margin remained de minimis, provided an adequate explanation for why A-A cannot account for the significant price differences.

"when comparing the weighted-average dumping margins calculated using the average-to-average method for all U.S. sales and the average-to-transaction method for all U.S. sales, there is a meaningful difference in the results (i.e., the margin moves across the de minimis threshold)."  Devi Fisheries' Prelim. Calcs. at 2.  Similarly, for Falcon Marine, Commerce explained that "when comparing the weighted-average dumping margins calculated using the average-to-average method for all U.S. sales and the 'mixed alternative' methodology, there is a meaningful difference in the results (i.e., the margin moves across the de minimis threshold)."  Falcon Marine's Prelim. Calcs. at 2.  As a result, Commerce proceeded to apply A-T in some form to calculate the mandatory respondents' dumping margins.  See Devi Fisheries' Prelim. Calcs. at 2; Falcon Marine's Prelim. Calcs. at 2.

The court must address whether Commerce's explanation for why A-A cannot account for the pattern of significant price differences is reasonable.  See State Farm, 463 U.S. at 48–49; Fujitsu General Ltd., 88 F.3d at 1039; Ceramica Regiomontana, S.A., 636 F. Supp. at 966, aff'd, 810 F.2d at 1139.  Commerce's rationale presumes that A-A cannot account for the pattern of significant price differences if the difference in the margins calculated using A-A and A-T is meaningful.  As stated previously, Commerce's explanation posits that there is a meaningful difference where the A-A calculated margin is de minimis and the A-T calculated margin is not de minimis.  Implicit in Commerce's meaningful differences analysis is that A-A can account for some degree of price differences.  There may be instances where the identified prices differences do not mask dumping or the masked dumping itself is de minimis.  However, where the amount of

uncovered masked dumping results in an A-T calculated margin that is not <u>de minimis</u>,

and the A-A calculated margin would be <u>de minimis</u>, it is reasonable for Commerce to

presume that A-A cannot account for the pattern of significant price differences because,

unlike A-T, A-A cannot uncover the dumping that was masked by the differentially priced

sales. The fact that A-A was unable to calculate more than a negligible dumping margin

while A-T was able to is reason enough to demonstrate that A-A could not account for the

pattern of significant price differences here.[24]

---

[24] In other instances, the Court has found that Commerce has failed to satisfy its obligation to explain why A-A cannot account for the pattern of significant price differences. <u>See, e.g.</u>, <u>Beijing Tianhai Industry Co. v. United States</u>, 39 CIT __, __–__, 106 F. Supp. 3d 1342, 1349–51 (2015). Here, however, the court finds that Commerce's explanation for why A-A cannot account for the pattern of significant price differences is adequate given the circumstances.

Admittedly, the language of the statute and legislative history suggest that A-A will more often than not be able to account for the price differences identified pursuant to 19 U.S.C. § 1677f-1(d)(1)(B)(i). <u>See</u> 19 U.S.C. § 1677f-1(d)(1)(B)(ii); SAA at 843. However, the statutory directive for investigations, which now guides Commerce's approach in reviews, was written during a time when zeroing under A-A was allowed and indeed the norm in investigations. In such a case it might be rare that A-A could not account for differences and in those rare cases such an explanation would more easily present itself. Now that A-A no longer entails zeroing, <u>see generally</u> <u>Antidumping Proceedings: Calculation of the Weighted-Average Dumping Margin During an Antidumping Investigation; Final Modification</u>, 71 Fed. Reg. 77,722 (Dep't Commerce Dec. 27, 2006), Commerce is left in a difficult position because the statutory language remains the same despite the dramatic change in the A-A method. It is now unlikely that A-A could account for the price differences because A-A now provides offsets for negative dumping, which may mask those price differences rather than account for such differences.

Nonetheless, there are cases where despite the finding of a pattern of export prices that differ significantly, A-A will be able to account for those differences. For example, A-A would be able to account for the pattern of significant price differences if the respondent's dumping, if any, is not masked by the significant price differences.

Where the dumping is masked by the significant price differences, it is unlikely that A-A will be able to account for those price differences. In those cases, Commerce has implemented a practice of using the meaningful differences analysis, which effectively presumes that A-A cannot account for the pattern of significant price differences if the A-T calculated margin crosses the <u>de minimis</u> threshold while the A-A calculated margin remains <u>de minimis</u>. To provide an explanation, Commerce must draw a connection between the differences and the efficacy of A-A

(footnote continued)

Moreover, reasonableness in a review is particularly tied to the objective of the review itself.  Administrative reviews have unique "transactional accuracy interests," and, as a result, the objective of a review is to uncover dumping with greater specificity.  See Union Steel v. United States, 713 F.3d 1101, 1104 (Fed. Cir. 2013).  In furtherance of that objective, it is reasonable for Commerce to presume that A-A cannot account for the price differences in instances where A-A is unable to uncover any dumping at all and A-T is able to do so.  Therefore, Commerce's explanation that A-A could not account for the significant price differences here is reasonable.

Plaintiffs argue that Commerce improperly considered all sales in the meaningful difference analysis rather than limiting the analysis to targeted sales.  See Pls.' Mot. 31–33.  Plaintiffs contend that Commerce's requirement to explain why A-A cannot account for "such differences" is in direct reference to the export prices that exhibited significant price differences, i.e., passed the Cohen's d test, which Plaintiffs refer to as targeted sales.  See id. at 32.  Plaintiffs are unable to point to any authority that restricts Commerce from comparing margins encompassing all sales rather than comparing margins limited to the sales that passed the Cohen's d test.  It is reasonable for Commerce to judge

---

as compared to A-T.  Here, Commerce observed the differences in the margins calculated by the two methods and presumed that the significant price differences cannot be accounted for by A-A because "when comparing the weighted-average dumping margins . . . , there is a meaningful difference in the results (i.e., the margin moves across the de minimis threshold)."  Devi Fisheries' Prelim. Calcs. at 2; Falcon Marine's Prelim. Calcs. at 2.  The court can discern from Commerce's explanation that A-A cannot account for the pattern of significant price differences because A-A masked the dumping that was occurring as revealed by the A-T calculated margin.  Thus, the meaningful difference between the margins demonstrated that A-A is not equipped to uncover the mandatory respondents' dumping.  Although the court finds Commerce's explanation to be less than ideal, Commerce adequately explained why A-A cannot account here.

whether A-A is able to account for the price differences by assessing its ability to do so against all sales, as it would ultimately need to be able to do so when calculating the dumping margin.

Similarly, Plaintiffs' argument that Commerce's meaningful differences analysis "was mostly just measuring the effect of zeroing" lacks merit. Id. at 34. Plaintiffs contend that if Commerce were to eliminate zeroing on the A-T side of the comparison or zero for both the A-T and A-A margin calculations, the difference between the A-T and A-A margins for the mandatory respondents are minimal. See id. While Plaintiffs may be correct that the A-T and A-A margins would be nearly identical if one were to either eliminate zeroing or zero on both sides of the comparison, that fact does not present an arguable issue because zeroing is used in conjunction with A-T and has been affirmed as reasonable by the Court of Appeals for the Federal Circuit.[25] The purpose of A-T is to reveal those cases where offsetting masks dumping, and that purpose is achieved by zeroing. Indeed, without zeroing the A-A and A-T comparison methodologies "would always be mathematically equivalent, obviating any benefit derived from having an

---

[25] The A-T method, unlike the A-A comparison method, is typically used in conjunction with "zeroing where negative dumping margins (i.e., margins of sales of merchandise sold at nondumped prices) are given a value of zero and only positive dumping margins (i.e., margins for sales of merchandise sold at dumped prices) are aggregated." See Union Steel, 713 F.3d at 1104 (internal quotations omitted); see also Final Modification, 77 Fed. Reg. at 8,101. Zeroing has been found as a reasonable interpretation of "dumping margin" in 19 U.S.C. § 1677(35)(A). See, e.g., Timken Co. v. United States, 26 CIT 1072, 1085–86, 240 F. Supp. 2d 1228, 1242–44 (2002) aff'd, 354 F.3d 1334, 1340–45 (Fed. Cir. 2004) (determining that zeroing in an administrative review was a reasonable interpretation of an ambiguous statute); Corus Staal BV v. Dep't of Commerce, 27 CIT 388, 395–400, 259 F. Supp. 2d 1253, 1260–65 (2003) aff'd, 395 F.3d 1343, 1347 (Fed. Cir. 2005) (determining that zeroing in an antidumping duty investigation was a reasonable interpretation of an ambiguous statute).

alternative comparison methodology in the statute." Def.'s Resp. 40. The zeroing characteristic of A-T is inextricably linked to the comparison methodology and its effect in the meaningful difference analysis does not render the approach unreasonable. Thus, despite Plaintiffs' contentions, Commerce's determination that A-A could not account for the significant price differences here is reasonable.

### C. Commerce's Application of the Mixed Comparison Methodology

Plaintiffs argue that in applying the mixed comparison methodology[26] and aggregating the A-T and A-A margins to calculate Falcon Marine's weighted-average dumping margin, Commerce improperly used what Plaintiffs refer to as "double-zeroing." See Pls.' Mot. 37–43. Defendant responds that Plaintiffs' claim lacks a legal basis for restricting Commerce's discretion, and Commerce's approach is reasonable because it allows Commerce to avoid potential remasking of dumping. See Def.'s Resp. 41–44.

In those cases where between 33% and 66% of the value of a respondent's U.S. sales pass the Cohen's d test, Commerce applies a hybrid methodology whereby it applies A-T only to a portion of a respondent's sales. See Prelim. I&D Memo at 6. Under

---

[26] According to Commerce's practice, the ratio test supports applying A-T to all U.S. sales, whether passing the Cohen's d test or not, if the value of the sales passing the Cohen's d test accounts for at least 66% of the value of all sales. See Prelim. I&D Memo at 6. Within this threshold, Commerce views the extent of the significance of the price differences to be so pervasive as to warrant applying A-T to all U.S. sales. Conversely, the ratio test does not support application of the alternative A-T method to any sales if the sales passing the Cohen's d test account for 33% or less of the value of all sales. See id. Commerce views sales under this category fall short to constitute a pattern of significant price differences. However, the ratio test supports application of a mixed methodology, combining two margins calculated by applying A-T only to those sales passing the Cohen's d test and A-A to all other sales, if the sales passing the Cohen's d test account for more than 33% but less than 66% of the value of all sales. See id. Thus, Commerce has fashioned remedies dependent upon which threshold the respondent's pricing behavior falls under.

this hybrid methodology, Commerce calculates two weighted-average dumping margins, one using A-T with zeroing, and a second margin using A-A with offsets of negative dumping to the other sales. Commerce then aggregates the two calculated margins and in the process prevents any excess negative dumping from the A-A calculated margin from negating the A-T calculated margin. Plaintiffs' challenge lies in the last step of the methodology.

Here, Commerce calculated a combined margin of 3.01% for Falcon Marine by applying A-T to its sales that passed the Cohen's d test and applying A-A to the sales that did not pass the Cohen's d test. See Falcon Marine's Prelim. Calcs. at 2. Commerce aggregated the two calculated margins but did not allow the A-A calculated margin to provide for additional offsets while aggregating the margins. Commerce justified its method with the following explanation:

> The [A-A] method and the [A-T] method are different comparison methods which are provided for in the act and regulations and which are distinct and independent from each other. . . . To calculate the weighted-average dumping margin for a respondent whose sales have been evaluated using more than one comparison method, the Department reasonably aggregates the results of each of these distinct comparison methods . . . . To allow for offsets when combining the results of the mixed comparison approach would defeat the purpose of the [A-T] method . . . . Such an approach would allow the results of the [A-A] method to reduce or completely negate the results of the [A-T] method prescribed by [19 U.S.C. § 1677f-1(d)(1)(B)]. Instead, by preserving the results of the [A-T] method, the Department ensures that the purpose of the [A-T] method of uncovering masked dumping is fulfilled, just as it is when the Department applies the [A-T] method as a singular comparison method.

Final I&D Memo at 35–36.

Plaintiffs do not challenge Commerce's decision to apply a hybrid methodology, nor the thresholds it has established.  Instead, Plaintiffs contend that although Commerce must necessarily calculate two separate rates, A-T for the differentially priced sales and A-A for the other sales, it should allow the remaining non-dumped sales from the latter group to offset the dumping in the former rather than zero them when the two rates are combined.  <u>See</u> Pls.' Mot. 37–43.  Given that there is no legal authority that constrains how Commerce is to apply A-T when appropriate or arrive at the final margin in its hybrid methodology, the court must only address whether Commerce's methodology is reasonable.  <u>See</u> <u>Fujitsu General Ltd.</u>, 88 F.3d at 1039; <u>Ceramica Regiomontana, S.A.</u>, 636 F. Supp. at 966, <u>aff'd</u>, 810 F.2d at 1139.

Commerce has crafted an analysis that applies A-T in proportion to the degree of a respondent's impermissible pricing behavior.  Such a scheme is consistent with the fact that the antidumping duty regime is intended to be remedial as opposed to punitive.  <u>See</u> <u>Agro Dutch Indus. Ltd. v. United States</u>, 508 F.3d 1024, 1027 (Fed. Cir. 2007) ("The purpose of the antidumping statute is to prevent foreign goods from being sold at unfairly low prices in the United States to the injury of existing or potential United States producers.").  To calculate Falcon Marine's weighted-average dumping margin in the mixed comparison methodology, Commerce had the option to aggregate the two calculated margins by either providing for or not providing for offsets where there was negative dumping in the sales subject to A-A.  Commerce has made the discretionary decision not to provide for offsets to calculate the weighted-average dumping margin for a respondent whose dumping has been assessed using more than one comparison

method.  Commerce's method of aggregating two separate weighted averages, one with

offsets and one without, is reasonable because it proportionately applies the remedy

across the sales.  It is not unreasonable for Commerce to decline to use offsets during

the aggregation stage because, as explained by Commerce, without such offsets, the

masked dumping uncovered by the analysis is preserved and the A-T remedy

nonetheless remains confined to the differentially priced sales by "summing the amount

of dumping and the U.S. sales value for each of these methods."  Final I&D Memo at 35–

36.

       Plaintiffs' argument that "double-zeroing" results in an arbitrary and unfair rate is

belied by its own example.  See Pls.' Mot. Attach. 1 at 1.  In a comparison of positive

dumping and negative dumping on both A-A and A-T sales, Plaintiffs contend Falcon

Marine receives a 3.01% rate with double-zeroing and a 1.52% rate without double-

zeroing.  But Plaintiffs fail to consider the fact that the 3.01% rate is a rate that is derived

from dividing its A-T sales by the value of all its sales, both sales that were found to be

differentially priced and those that were not.[27]  See id. at 1 n.2.  The A-T rate has already

been offset by virtue of the aggregation of the two rates because the 3.01% rate is a

---

[27] Plaintiffs argue that Commerce should further offset the total amount of dumping with Falcon Marine's negative dumped sales before aggregating the A-T and A-A calculated margins, i.e., (([[          ]] − [[             ]]) / [[               ]], for an antidumping duty rate of 1.52%.  See Pls.' Mot. Attach. 1 at 1.  Commerce has instead chosen to aggregate the A-T and A-A calculated margins by dividing the total amount of the uncovered dumping by the value of all sales, i.e., [[          ]] / [[             ]], to arrive at an antidumping duty rate of 3.01%.  See Falcon Marine Prelim. Calcs. at 70 (providing the value of the dumped sales and all sales).  Commerce has fashioned a remedy calling for an intermediary application of A-T that is proportionate to the degree of masked dumping in relation to the value of all sales.  See Falcon Marine Prelim. Calcs. at 70 (providing the value of the dumped sales and all sales subject to A-T).

function of the value of the dumped sales relative to the total value of all sales.  Thus, Commerce's aggregation method is reasonable because the remedy for Falcon Marine's pricing behavior has been limited to address the masked dumping by proportionally applying the remedy across all sales.

Plaintiffs' proposition to provide for further offsets could render the A-T method ineffective in situations where a respondent's U.S. sales fall between the 33% and 66% threshold and result in a negative dumping margin in the A-A side of the equation.  As Defendant points out, Plaintiffs are supporting "double-offsetting" in the process of arguing that Commerce has "double-zeroed."  <u>See</u> Def.'s Resp. 44.  It is reasonable for Commerce to prevent the A-A margin from diminishing the A-T margin for the same reasons why the A-T method does not provide for offsets for negative dumping.  Margins calculated using A-T only trend upwards due to the inherent nature of the methodology. To declare Commerce's refusal to offset the A-T margin with the A-A margin unreasonable would in turn undermine the A-T method as a whole.

## V.    Commerce's Rejection of Respondents' Administrative Case Brief Was Reasonable and in Accordance with Law

Plaintiffs contend that Commerce's rejection of Respondents' case brief was unsupported by substantial evidence and not in accordance with law.  <u>See</u> Pls.' Mot. 45. Defendants argue that Respondents "filed untimely new factual information in their initial case brief."  Def's Resp. 45.  Commerce properly rejected Respondents' case brief for containing untimely filed new factual information.

Commerce's regulations specify deadlines for when parties must make submissions.  See e.g., 19 C.F.R. § 351.301(a) (providing that "[t]his section sets forth the time limits for submitting factual information").  For reviews commenced prior to May 10, 2013, any submission of factual information is due no later than "140 days after the last day of the anniversary month" of the antidumping duty order.  19 C.F.R. § 351.301(b)(2).  The regulations define factual information as "(i) [i]nitial and supplemental questionnaire responses; (ii) [d]ata or statements of fact in support of allegations; (iii) [o]ther data or statements of facts; and (iv) [d]ocumentary evidence."[28]

---

[28] Commerce modified its regulation providing for the definition of factual information.  The regulation now provides the following definition:

> (21) Factual information.  "Factual information" means:
>
> (i) Evidence, including statements of fact, documents, and data submitted either in response to initial and supplemental questionnaires, or, to rebut, clarify, or correct such evidence submitted by any other interested party;
>
> (ii) Evidence, including statements of fact, documents, and data submitted either in support of allegations, or, to rebut, clarify, or correct such evidence submitted by any other interested party;
>
> (iii) Publicly available information submitted to value factors under § 351.408(c) or to measure the adequacy of remuneration under § 351.511(a)(2), or, to rebut, clarify, or correct such publicly available information submitted by any other interested party;
>
> (iv) Evidence, including statements of fact, documents and data placed on the record by the Department, or, evidence submitted by any interested party to rebut, clarify or correct such evidence placed on the record by the Department; and
>
> (v) Evidence, including statements of fact, documents, and data, other than factual information described in paragraphs (b)(21)(i)–of this section, in addition to evidence submitted by any other interested party to rebut, clarify, or correct such evidence.

19 C.F.R. § 351.102(b)(21) (2015).  However, this definition for factual information only applies to

(footnote continued)

19 C.F.R. § 351.102(b)(21).   Notwithstanding 19 C.F.R. § 351.301(b)(2), interested parties may submit factual information to rebut factual information submitted by another interested party "prior to the deadline," or, "[i]f factual information is submitted less than 10 days before, on, or after . . . the application deadline for submission of such factual information, . . . no later than 10 days after the date such factual information is served on the interested party."  See 19 C.F.R. § 351.301(c)(1).   When Commerce rejects factual information as untimely, it disregards it in making any determination, and the record reflects it for the sole purpose of "documenting the basis for rejecting the document."  19 C.F.R. § 351.104(a)(2).

On May 2, 2014, Respondents submitted a case brief disputing the propriety of the differential pricing analysis.  See generally Respondents' Rejected Case Brief, PD 150–51 at bar code 3199459-01 (May 2, 2014).   Commerce rejected Respondents' case brief for containing expert economic analysis and excerpts from a U.S. International Trade Commission ("ITC") Staff Report, which Commerce considered to be untimely filed new factual information pursuant to 19 C.F.R. § 351.301(b)(2).  See First Rejection Letter at 1, PD 153 at bar code 3199778-01 (May 5, 2014); First Rejection Memorandum, PD 154 at bar code 3199858-01 (May 6, 2014).   Respondents re-filed the case brief with the rejected information redacted.  Respondents twice sought reconsideration but were rejected.  See generally Respondents' Case Brief, PD 156–57 at bar code 3200354-01

_____

proceedings initiated on or after May 10, 2013.  See Definition of Factual Information and Time Limits for Submission of Factual Information, 78 Fed. Reg. 21,246, 21,246 (Dep't Commerce Apr. 10, 2013).  Because the instant review was commenced on April 2, 2013, the former version of the definition for factual information governs this case.

(May 8, 2014); Second Rejection Letter, PD 164 at bar code 3201803-01 (May 14, 2014);

Second Request for Reconsideration, PD 167 at bar code 3202381-01 (May 16, 2014);

Second Rejection Memorandum, PD 168 at bar code 3202864-01 (May 20, 2014); Letter

from Commerce Pertaining to New Factual Information, PD 170 at bar code 3206406-01

(June 2, 2014).

Commerce reasonably rejected Respondents' case brief for containing untimely

filed new factual information.  Because Respondents submitted their case brief on

May 2, 2014, any new factual information was untimely as the deadline for such

information was July 18, 2013.  See 19 C.F.R. § 351.301(b)(2).  Commerce noted that

the information consisted of "1) an analysis submitted by the respondents' affiant,

including this individual's credentials; 2) citations to, and information from, statistical

reference materials; and, 3) data from other U.S. government agencies," and concluded

that "[s]uch categories of information are more than mere argument."  Final I&D Memo at

40.  As Commerce correctly concluded, Respondents' expert economic opinion included

statistical references, analysis, and mathematical formulae not previously submitted on

the administrative record.   Thus, the expert opinion provided evidentiary support for

Respondents' argument using information that was not on the record.   Even if

Respondents' expert opinion only analyzed information already on the record, the expert

analysis "clearly assumes the weight of evidence and, as such, amounts to [d]ata or

statements of fact in support of allegations, i.e., factual information." See PSC VSMPO-

Avisma Corp. v. United States, 688 F.3d 751, 760–61 (Fed. Cir. 2012) (internal quotations

omitted).   Similarly, Respondents' excerpt of the ITC Staff Report included data not

previously on the administrative record "submitted for the purpose of the facts contained therein."  Final I&D Memo at 42.  Thus, Commerce's determination that Respondents' case brief contained untimely new factual information is supported by substantial evidence and in accordance with law.

Plaintiffs contend that Commerce improperly rejected the information in their case brief because such information was argument, not new factual information.  See Pls.' Mot. 46.  However, Plaintiffs do not provide any authority to support their conclusory claim that Respondents' submission contained argument rather than factual information.

Plaintiffs alternatively assert that Respondents' case brief rebutted new information placed on the record by Commerce in the preliminary results.  See Pls.' Mot. 46; Pls.' Reply 28–29.  As a preliminary matter, Commerce's preliminary determination does not contain new factual information.  In its preliminary determination, Commerce makes its findings based on information that has been timely submitted and placed on the record.  Further, Commerce's regulation permits the submission of new factual information to rebut information submitted by an interested party, not Commerce. See 19 C.F.R. § 351.301(c)(1) (providing that "[a]ny interested party may submit factual information to rebut, clarify, or correct factual information submitted by any other interested party") "Interested party" includes, among others, foreign manufacturers, foreign exporters, foreign producers, or U.S. importers, but does not include Commerce.

<u>See</u> 19 U.S.C. § 1677(9).[29]  In fact, Commerce is separately listed as "Department" under 19 C.F.R. § 351.102(b)(15) and "Administering authority" under 19 U.S.C. § 1677(1)." The regulation confers a limited right to submit new information as rebuttal only after another interested party has submitted factual information and fails to offer the support Respondents need.[30]

Plaintiffs contend that Commerce's rejection of Respondents' case brief denied Respondents a meaningful opportunity to comment because the Cohen's d test was first announced in the preliminary results, promulgated on March 25, 2014, long after the July 18, 2013 deadline for submitting new factual information.  <u>See</u> Pls.' Mot. 46; Pls.' Reply 28–29.  At oral argument, Plaintiffs further argued that Respondents were first given notice of the specifics of the analysis and determined there was a need to obtain an expert to make a challenge when the preliminary results were issued.  <u>See</u> Oral Arg., 1:58:40–2:00:38.

---

[29] The regulations do not expressly provide for a definition of "interested party," but incorporate terms defined in the Tariff Act of 1930, as amended, that are not defined in the relevant regulations.  <u>See</u> 19 C.F.R. § 351.102(a), (b)(17), (b)(42) (directing attention to 19 U.S.C. § 1677(9)(A)–(G) for definitions of domestic and respondent interested party).

[30] Even if Commerce were considered an interested party, Plaintiffs still cannot avail themselves of the rebuttal exception, as the exception confers the right to rebut information submitted by an interested party no later than 10 days after such submission.  <u>See</u> 19 C.F.R. § 351.301(c)(1). Respondents did not submit the new factual information until 45 days after the preliminary results were issued.  While the case brief was timely, the factual information contained therein was untimely even for rebuttal purposes.  The court recognizes that Commerce has since amended its regulations to provide interested parties a single opportunity "to submit factual information to rebut, clarify, or correct factual information placed on the record of the proceeding by the Department by a date specified by the Secretary."  19 C.F.R. 351.301(c)(4) (2015).  However, this provision only applies to proceedings initiated on or after May 10, 2013.  <u>See</u> <u>Definition of Factual Information and Time Limits for Submission of Factual Information</u>, 78 Fed. Reg. 21,246, 21,246 (Dep't Commerce Apr. 10, 2013).

Respondents had notice and a meaningful opportunity to comment upon the Cohen's d test before the preliminary results were issued.  Respondents were entitled to "'notice and a meaningful opportunity to be heard.'"  PSC VSMPO-Avisma Corp., 688 F.3d at 761–62 (quoting LaChance v. Erickson, 522 U.S. 262, 266 (1998)).  Respondents' case brief contained both specific and general challenges with respect to Commerce's differential pricing analysis.  As Commerce noted, the Cohen's d test was announced in a post-preliminary analysis memo promulgated on March 4, 2013 in connection with the investigation of xanthan gum from the People's Republic of China, before the instant review had even been initiated.  See Xanthan Gum From the People's Republic of China, 78 Fed. Reg. at 33,351 n.2 (citing to the March 4, 2013 post-preliminary differential pricing analysis); see also Final I&D Memo at 41.   Further, Commerce cited to two other administrative reviews where it employed the Cohen's d test prior to the July 18, 2013 deadline.  See Final I&D Memo at 41 n.156 (citing Circular Welded Carbon Steel Pipes and Tubes From Thailand, 78 Fed. Reg. 21,105 (Dep't Commerce Apr. 9, 2013) (preliminary results of antidumping duty administrative review; 2011-2012); Certain Activated Carbon From the People's Republic of China, 78 Fed. Reg. 26,748 (Dep't Commerce May 8, 2013) (preliminary results of antidumping duty administrative review; 2011-2012)).  Thus, Respondents were given adequate notice to timely submit the factual information necessary to at least make its facial challenges to the analysis.

Moreover, despite Plaintiffs' position that Respondents needed information regarding the specific calculations in the differential pricing analysis in order to meaningfully comment, Respondents failed to request that Commerce extend the

deadline for interested parties to submit factual information.  See id. at 41.  Respondents had the opportunity to submit factual information challenging the Cohen's d test in a timely fashion, at least for its general challenges to Commerce's analysis, but failed to do so. Respondents' sole opportunity to comment was not in its case brief as Plaintiffs claim.

Lastly, Plaintiffs citation to Wuhu Fenglian Co. v. United States, 37 CIT __, 836 F. Supp. 2d 1398 (2012), as support for its argument is inapposite.  Plaintiffs argue that Wuhu stands for the proposition that "Commerce abuses its discretion if it does not allow a party to rebut information placed on the record by Commerce, even if there is no regulation requiring such a practice."  Pls.' Mot. 45–46.  In that case, Commerce had placed CBP data on the record and the court found it abused its discretion by not allowing parties to rebut that information simply because the regulations do not authorize interested parties to do so.  However, CBP data used for the purposes of supplementing the record cannot be analogized with the issuance of preliminary results.  Commerce does not place new factual information on the record through issuance of the preliminary results.  Preliminary results embody Commerce's preliminary findings after it considers the information that has been timely submitted and placed on the record.  Thus, there was no new factual information for the Respondents to rebut.  Commerce did not abuse its discretion when it rejected Respondents' case brief for containing untimely filed factual information.

### CONCLUSION

For the reasons discussed above, the court determines that the final results are supported by substantial evidence and in accordance with law.   Therefore, Plaintiffs' motion for judgment on the agency record is denied and the final results are sustained. Judgment will be entered accordingly.


 /s/ Claire R. Kelly
Claire R. Kelly. Judge

Dated: February 2, 2016
          New York, New York